SUZANNE POLKEY, Plaintiff-Appellee, *v.* ZANDER PHILLIPS, Defendant-Appellant.—(GEORGIANNA MEYERS *et al.*, Plaintiffs.)

First District (1st Division)   No. 79-1092

Opinion filed July 21, 1980.

Stern, Rotheiser & Dupree, of Chicago, for appellant.

William R. Jacobs, II, of Jacobs, Camodeca & Timpone, of Chicago, for appellee.

Mr. JUSTICE O'CONNOR delivered the opinion of the court:

Plaintiffs were the driver and passengers of a car which struck the car driven by defendant, Zander Phillips. The trial judge found defendant guilty of negligence as a matter of law and so directed the jury, which returned a separate verdict in favor of each plaintiff. The jury also found by a special interrogatory that the plaintiff driver, Georgianna Meyers, was guilty of contributory negligence, and the trial judge entered judgment *n.o.v.* for defendant against Georgianna Meyers based on the answer to the special interrogatory. The defendant appeals only from the judgment against him in favor of Suzanne Polkey (plaintiff), one of the passengers.

On appeal, defendant contends that the trial judge erroneously directed the jury that defendant was guilty of negligence as a matter of law and that the jury's verdict of $46,250 for plaintiff Suzanne Polkey was the result of an incorrect formula submitted to the jury in the closing argument of plaintiffs' counsel.

The car in which plaintiff was riding in the right front passenger seat had left the southbound Kennedy Expressway at the Ohio Street exit and was eastbound on the Ohio Street extension. Defendant had left the northbound Kennedy Expressway at the Ohio Street exit and was eastbound on the Ohio Street extension at the merging point of the two exit ramps. At that point, there were three lanes for traffic. Defendant was in the southmost lane and plaintiffs' car was in the northmost. The pavement was wet. Defendant skidded and came to rest in the northmost lane facing north, where plaintiffs' car collided with his left front side.

Georgianna Meyers testified that about 9 p.m. on July 9, 1974, she was driving eastbound 30-35 miles per hour in the extreme lefthand lane of the Ohio Street exit from the southbound Kennedy Expressway. It was raining. When she first saw defendant, he was in the extreme righthand lane of the exit ramp for the northbound Kennedy Expressway. Defendant was going 50-60 miles per hour when he started sliding. He skidded from the righthand lane, across the second lane and into her lane, stopping headed north and taking up all of her lane. When she saw defendant skidding, she put on her brakes about 43 feet from defendant, who was not then in her lane. From the time she put on her brakes two or three seconds elapsed until the collision with defendant, who was stopped. She further testified that she did not see any cars in front of defendant; nor did she recall seeing any brake lights go on in either of the other two lanes.

Mariellyn Kresin and Kathleen Kozlak, passengers in the rear seat,

testified that defendant was going faster than their car, skidded into their lane, stopped and was hit by their car. The time between seeing defendant skidding and the collision was only a matter of seconds. Before the collision, the driver of their car yelled, "We are going to hit him." Kresin also testified that defendant said he was sorry. Kozlak also testified that when she first saw defendant's car he was going 50, 55 miles an hour. At that point he was ahead of their car and to their right in the second lane. He stopped in a matter of seconds; their car did not. Her car was going 20, 25 miles per hour at the impact. Defendant asked if everyone was all right. She was sure that defendant said to the police officer, "Man, I was speeding."

Plaintiff Suzanne Polkey, the passenger in the right front seat, testified that when she first saw defendant's car her car was going 25-30 miles per hour and defendant's probably around 55-60. He was skidding and stopped in their lane. Her car was going 20-25 miles an hour when they hit him. She heard her driver yell, "My God, we are going to hit him."

Anthony Trunzel, the police officer who investigated the accident, testified that defendant told him he came off the Dan Ryan Expressway into the Kennedy Expressway to go eastbound on the Ohio Street exit. He was in the third lane, lost control, spinning out and going all the way into the first lane. Defendant did not tell him that there was a car in front that slammed on its brakes, causing him to brake and lose control. Defendant started skidding when he was changing from the third lane to the second; then lost control and wound up in the first lane.

Defendant, called in plaintiffs' case as an adverse witness, testified that he did not know what time the accident happened. It was drizzling a bit at the time of the accident. He was going about 30 when he took the Ohio Street cutoff. He had been driving about 50 on the Kennedy Expressway. He first said he had been driving 3 or 4 years, and then said less than 2. He did not remember telling the police officer "I was going too fast. I was speeding." Perhaps he made such a statement. He did not know. He never told anyone in plaintiffs' car that he was sorry, really sorry. He did ask them, "Is everybody O.K.?"

Defendant was stopped 20, 25 seconds before he was hit. He saw people in the other car talking before the accident. He looked at a pair of headlights coming at him and could see through the windshield. The windshield wipers were on. He saw the two people in the front seat talking. He does not know if the headlights were on the car as it came toward him. He is not sure. He was not looking at the headlights; he was looking at the car.

When he came out of the Ohio Street ramp onto the Ohio Street extension, he was in the southmost lane. When he reached the merger, he was going 30, 35. The street was wet. When he came around the curve he

put on his brakes to slow from 30-35 down to 20, 25; "I don't know." After coming out of the curve he speeded back up to 35, 30. He increased his speed when he was in the straightaway. He could see six or seven car lengths ahead. The traffic was not stopped. He continued to accelerate. There was no traffic directly in defendant's lane. There was in the lane to the left. Defendant put on his brakes again when the car in front of him hit the brakes. Defendant was about 2½, three car lengths from the car in front of him, going about 35, 40. Defendant was in the third (southmost) lane at that point. When the car put on its brakes, defendant jammed on his, skidded to the left and went over to the first (northmost) lane. When he applied his brakes, defendant did not have to cross into lane two. He merged into lane two because he was trying to go all the way to lane one.

When the accident happened, the front end of defendant's car was at an angle facing northwest, with the right part of his car against the curb of the first (northmost) lane and the rear extending half over into the second lane.

When he applied his brakes, he started from lane three. His car did not fish-tail on the wet pavement. He was in lane three, hit his brakes and slid into lane one. He almost lost control of his car.

When he first applied his brakes, he was in lane two (the middle lane), into which he had moved three or four car lengths past the merger point. He was going 30, 35 when he changed lanes. He gave a turn signal to do that. The car that put on its brakes was also in lane two. Defendant then put on his brakes; as a result, his car swung almost completely around, ended up in lane one and came to a dead halt. From the time defendant applied his brakes, his car travelled three or four car lengths; "I don't know."

The distance from where defendant first saw the car put on its brakes until defendant finally stopped was 43-45 feet. He was stopped for 20, 25 seconds, "I don't know." When he put on his brakes he did not see plaintiffs' car. When he stopped he saw it coming straight toward him four or five car lengths away. He is not sure he was stopped 20-30 seconds. He was not counting the seconds. He told his girlfriend, who was in the car with him, that plaintiffs' car was going to hit him.

He told the police officer how the accident happened the best he could recall. He didn't remember whether he told him he skidded from lane three into lane one, that he lost control of the car, or that he was going too fast. He did not tell him that he was speeding. When he put on his brakes, his car slid and also skidded. He almost lost control.

Under questioning by his own counsel, defendant testified that he was not speeding when he applied his brakes; he was not going too fast. He does not know how long it was from the time he stopped that he saw

plaintiffs' car coming. From the time he saw it coming until it hit him was 10 or 15 seconds.

When questioned by plaintiffs' counsel as to whether he meant it took plaintiffs' car 15 to 20 seconds to travel three or four car lengths, he did not know how many seconds. As to whether he was saying it took 10 to 15 seconds, or 15 to 20, or 20 to 25 to cover that distance, it could have been more; it could have been less.

In his case in chief, defendant testified that the streets were wet. His speed on the Ohio Street ramp was 25, 30 miles an hour. On Ohio, he picked his speed back up to about 35. When he first got on Ohio, he was in the third lane (the southern-most). The accident happened about one-half block after getting off the ramp onto Ohio. Before the accident he changed lanes from the third to the second. He was going 35, 36 miles an hour. When he changed lanes, he saw cars ahead of him in lanes two and one; those in lane two were about three car lengths in front of him; those in lane one, about seven or eight. The car in front of him in lane two hit his brakes. Defendant jammed on his brakes and slid into lane one. When he jammed on his brakes he was going 37, 35 miles an hour. He did not hit anything. He stopped in lane one, facing north. His car stalled and wouldn't start. While trying to start his car, he saw plaintiffs' car three or four car lengths away coming toward him. There were four people in that car. The two in the front seat were talking. He could tell they were talking because the driver had her head turned toward the passenger on her right.

He further testified that he thought he had told the police officer that the car ahead of him jammed on its brakes. He did not tell him that he was speeding or going too fast; nor did he tell him that he had lost control in the right lane and ended up in the far left lane. He told him that he had lost control in the middle lane.

On cross-examination, defendant testified that he did not remember testifying the day before that he did not know if the streets were wet. He further testified that if the driver of plaintiffs' car had been yelling "We are going to hit that car," she would have been looking straight ahead and not have her head turned to the right. The headlights on plaintiffs' car were on as it came toward him. Yesterday he had said he did not know if they were on. He did not know whether plaintiffs' windshield wipers were on; he did not remember saying yesterday that they were. When he hit his brakes going 37 or 35 miles an hour, he was not going too fast for the condition of the pavement.

He never hit the car ahead of him which put on its brakes. He never saw that car skid.

He first saw plaintiffs' car coming toward him 43 to 50 feet away. Although he would say he was stopped 10 to 15 seconds before the

impact, he does not know how long he was stopped. He said nothing to plaintiffs about how the accident happened. He does not remember testifying yesterday that he said, "I'm sorry; I'm really sorry." He didn't say that to plaintiffs. He never told the police officer he was driving too fast. He may have said he lost control and slid in the middle lane. He does not remember whether he said, "I couldn't stop in time." He told the police officer about the car in front of him. He heard the police officer testify yesterday. To his (defendant's) knowledge, the officer told the truth.

Sandra Foulkas, the passenger in defendant's car, testified that defendant's car was in lane two when the car ahead of it put on its brakes. Defendant hit his brakes and slid into lane one, where he was stopped when plaintiffs' car hit him. The witness saw the two people in the front seat of plaintiffs' car talking. The driver had her head turned toward the passenger on the right front seat. On cross-examination, her attention was called to certain discrepancies between her testimony and her deposition.

In rebuttal, Georgianna Meyers testified that she didn't turn her head to talk to her passengers. She did not recall whether she was talking to any of her passengers while on the ramp.

Plaintiff Suzanne Polkey, on cross-examination on rebuttal, testified that while they were on the ramp leading to Ohio Street she possibly could have said something. The driver did not say anything. Polkey thought she was directing her conversation to a passenger on the left side.

Defendant argues that the trial court erroneously directed the jury that defendant was guilty of negligence as a matter of law. We agree.

It is by now axiomatic that verdicts ought to be directed and judgments *n.o.v.* entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand. *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504.

But as the court observed in *Graves v. Wornson* (1978), 56 Ill. App. 3d 873, 877, 371 N.E.2d 692, *appeal denied* (1978), 71 Ill. 2d 603, quoting from *Wolfe v. Whipple* (1969), 112 Ill. App. 2d 255, 262, 251 N.E.2d 77:

> "* * * 'It is recognized in the *Pedrick* case, that where a substantial factual dispute is disclosed by the evidence, either on the issue of plaintiff's due care or defendant's negligence, or where an assessment as to credibility of witnesses and an election between conflicting evidence may be decisive, the constitutional right of the parties to a jury determination should be carefully preserved, and it would be erroneous to direct a verdict in such case. * * *'"

Further, as the court had said in *Ney v. Yellow Cab Co.* (1954), 2 Ill. 2d 74, 84, 117 N.E.2d 74:

> "Questions of negligence, due care and proximate cause are ordinarily questions of fact for a jury to decide. The right of trial by jury is recognized in the Magna Charta, our Declaration of Independence and both our State and Federal constitutions. It is a fundamental right in our democratic judicial system. Questions which are composed of such qualities sufficient to cause reasonable men to arrive at different results should never be determined as matters of law. The debatable quality of issues such as negligence and proximate cause, the fact that fair-minded men might reach different conclusions, emphasize the appropriateness and necessity of leaving such questions to a fact-finding body. The jury is the tribunal under our legal system to decide that type of issue. To withdraw such questions from the jury is to usurp its function. *Bailey v. Central Vermont Railway Co.* 319 U.S. 350."

When the evidence discloses a substantial factual dispute on either the issue of plaintiff's due care or a defendant's negligence, or whether the assessment of the credibility of the witnesses may be decisive, the court may not direct a verdict. *Liberio v. Patton* (1973), 9 Ill. App. 3d 955, 957, 293 N.E.2d 415.

Here, the credibility of not only defendant and his witness, but also of plaintiff and her witnesses could be decisive.

The fact that defendant skidded is not in and of itself evidence of negligence. In *Crosby v. Distler* (1976), 38 Ill. App. 3d 1058, 1061, 349 N.E.2d 448, *appeal denied* (1976), 63 Ill. 2d 555, a case involving a skidding automobile, the trial court set aside the jury's verdict for defendant and entered judgment for plaintiff notwithstanding the verdict. The appellate court, in reversing, stated:

> "We then reach the question as to whether or not the trial court should have substituted its judgment for that of the jury in determining whether or not the defendant was guilty of negligence. When all the evidence is examined in its aspect most favorable to defendant, we find, at most, a disputed factual question as to whether defendant was negligent. Certainly the mere fact that defendant's vehicle slid on ice is not in itself evidence of negligence. (See, *e.g., Brown v. Boyles* (1960), 27 Ill. App. 2d 114, 169 N.E.2d 273.) In this regard the statement of the court in *Ferdinand v. Lindgren* (1961), 32 Ill. 2d 133, 140, 177 N.E.2d 10, 14, is instructive:
>
> > '[T]hat the mere fact that an automobile has skidded is not indicative of actionable negligence; that proof that the

driver of the car, at the time the car skidded, was proceeding at a reasonable speed, and that he had reasonable control of the car under all the circumstances, may, with other facts appearing in evidence, convince a jury that the collision occurred without fault on the part of the defendant.'."

Further, defendant's testimony that the car in front of him suddenly braked could be viewed by the jury as bringing defendant face to face with an emergency. In *Rzeszewski v. Barth* (1944), 324 Ill. App. 345, 354-55, 58 N.E.2d 269, *appeal denied*, 326 Ill. App. xv, the court said:

"* * * Persons who have to act in a sudden emergency are not to be judged in the light of after events, but are to be judged, under all the circumstances of the case, by the standard of what a prudent person would have been likely to do under similar circumstances. *Barnes v. Danville St. R. & Light Co.*, 235 Ill. 566. The jury was required to determine whether defendant and Maroney were to be believed in their version of the occurrence and whether, accepting such version, defendant exercised due care. Where a person must act in an emergency it is for the jury to say whether he acted with that care and foresight which a reasonably careful and prudent driver would use in like circumstances. The question before the jury was purely one of fact. The reason why the defendant was on the wrong side of the highway was explained. There was evidence that tended to prove that defendant was not negligent even though his car did go over on the wrong side of the road. When there is evidence as to what actually happened, there is no room for presumptions. * * *"

In addition, because this collision occurred on one of our modern urban expressways, we must take into account the unique conditions which exist upon them. (*Larson v. Thomashow* (1974), 17 Ill. App. 3d 208, 307 N.E.2d 707.) In *Nei v. Contracting & Material Co.* (1968), 93 Ill. App. 2d 226, 229-30, 236 N.E.2d 264, this court said:

"Traffic conditions on modern expressways differ sharply from those on side streets, arterial streets or even highways. Traffic proceeds at a high rate of speed—the minimum speed permitted on the expressway where the accident took place is forty miles an hour—and vehicles are constantly changing lanes. The faster vehicles usually use the lane or lanes closest to the median strip. Vehicles entering an expressway cross through traffic to reach these lanes and vehicles leaving the expressway execute a like maneuver from the faster lanes to the exit ramps. The maximum speed for trucks is less than the maximum speed for automobiles. Autos move around trucks and trucks move around slow-moving autos.

Drivers are alert for openings and take advantage of those which enable them to change their positions. A careful driver, no matter what his speed, finds it almost impossible to maintain a safe distance from the car ahead; when he attempts to do so other cars quickly fill the space he has provided.

The purpose of expressways is to facilitate the rapid movement of a large number of vehicles through highly congested areas. To enforce a standard of care requiring drivers on expressways to maintain an interval between their vehicles and those in front of them so that, in all situations, they will be able to stop prior to coming in contact with the preceding vehicles or else be deemed guilty of contributory negligence as a matter of law would be unrealistic and would tend to defeat the very purpose for which expressways are constructed. Therefore, the circumstances which have led courts to find negligence as a matter of law in rear-end collisions on other roadways are not necessarily controlling in rear-end collisions on high-speed, urban expressways."

■■ Moreover, a driver approaching another vehicle from the rear has a duty to maintain a safe lookout and must take into account the prospect of having to stop his vehicle suddenly. This duty extends to drivers riding in adjacent lanes. Whether defendant was negligent in the execution of this duty was a question of fact to be determined by the jury. *Robinson v. Chicago Transit Authority* (1979), 69 Ill. App. 3d 1003, 1008, 388 N.E.2d 163.

■■ From our examination of the record and viewing the evidence in its aspect most favorable to defendant, we cannot say that there is no reasonable inference which could be drawn from the evidence to justify defendant's conduct as free from negligence. To the contrary, reasonable inferences could be drawn from which a jury could conclude that defendant was driving at a reasonable speed on the exit from a modern expressway and that he had to apply his brakes firmly when a preceding car suddenly braked, causing defendant to skid. The fact that contrary inferences could as readily be drawn from the evidence makes the case particularly one in which questions of negligence and contributory negligence should be decided by the jury. The jury here on the evidence found the driver of plaintiffs' car to be guilty of contributory negligence. By the same token, it should have been allowed to pass upon defendant's negligence. We conclude that the trial court erred in directing a verdict against defendant on the question of negligence.

*Sughero v. Jewel Tea Co.* (1967), 37 Ill. 2d 240, 226 N.E.2d 28, *affirming* (1966), 66 Ill. App. 2d 353, 214 N.E.2d 512, differs from this case. The defendant there had skidded into the oncoming traffic. The appellate court did not hold that skidding in and of itself constituted

negligence, but instead noted that the fact that two automobiles in front of defendant and the truck behind him were under sufficient control to stop within their lane of traffic indicated that defendant did not have his car under proper control. No such facts exist here.

In *Calvetti v. Seipp* (1967), 37 Ill. 2d 596, 227 N.E.2d 758, defendant, too, skidded into the opposing traffic. She offered no negligence-free explanation for her so skidding. Here, defendant testified to the sudden application of brakes on the car ahead. Furthermore, defendant did not collide with oncoming traffic. He was struck, after he had stopped, by traffic moving in the same direction.

Defendant also argues that the judgment for plaintiff Suzanne Polkey should be vacated because it resulted from her counsel's suggestion to the jury in closing argument that compensation for pain and suffering could be determined by a precise per annum formula. We disagree. The record shows that the argument suggesting $1000 per year for each year of life expectancy was not made with reference to Suzanne Polkey, but only with reference to plaintiff Kathleen Kozlak, whose life expectancy was 45 years. The jury obviously rejected that argument, because its verdict for Kathleen Kozlak was only $3600. Counsel had asked for $77,000. As to Suzanne Polkey, counsel had requested $175,200. The jury's verdict was $46,250. There is no claim that the verdict in her favor was excessive. In view of the fact, however, that this cause, if retried, will involve only Suzanne Polkey, we can assume that no per annum argument will be made as to her.

The judgment of the circuit court of Cook County in favor of Suzanne Polkey is reversed and the cause remanded for a new trial.

Reversed and remanded.

GOLDBERG, P. J., and CAMPBELL, J., concur.